CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

06/28/2019
JULIA C. DUDLEY, CLERK
BY:     s/ F. COLEMAN
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

### Lynchburg Division

| | | |
|---|---|---|
| Jane Doe, | ) | Case No. |
| | ) | |
|     Plaintiff, | ) | 6:19CV00043 |
| | ) | |
| v. | ) | |
| | ) | |
| Bedford County, Virginia, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| John W. Jones, Jr., Chief of | ) | |
|   Department, Bedford County | ) | |
|   Department of Fire & Rescue, | ) | |
|   in his individual capacity, | ) | |
| | ) | |
|     Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

COMES NOW Jane Doe, plaintiff, by counsel, who moves this Court to enter judgment against the defendants on the grounds stated herein.

## JURISDICTION

1.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this litigation involves claims for deprivation of civil rights under 42 U.S.C. § 1983 and the United States Constitution.

2.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) & (4) because this litigation involves claims for deprivation of civil rights under 42 U.S.C. § 1983.

3.    This Court has supplemental jurisdiction over Count III pursuant to 28 U.S.C. § 1367 because Count III is part of the same case or controversy that is the basis of the federal claims.

4.    Venue in this District is proper pursuant to 28 U.S.C. § 1391 because the conduct giving rise to this case and damages sustained by the plaintiff occurred in this District.

1

## PARTIES

5.     Jane Doe is the anonymous pseudonym of a female citizen of Bedford County, Virginia who, at the times relevant hereto, was a minor. She attained eighteen years of age on August 21, 2018.

6.     Jane Doe was under the disability of infancy until August 21, 2018 and the tolling provisions of Va.Code § 8.01-229 apply to her claims.

7.     Bedford County, Virginia ("the county") is a locality in the Commonwealth of Virginia.

8.     The county is subject to suit pursuant to Va.Code § 15.2-1404.

9.     Jane Doe gave the county notice of her claim pursuant to Va.Code § 15.2-209 within six months of her attainment of eighteen years of age. More than 90 days has elapsed since Jane Doe gave the county notice of her claim and the county has failed to act upon her claim.

10.     Defendant John W. Jones, Jr. is a permanent full-time employee of the county and is the Department Chief of the Department of Fire and Rescue.

## FACTUAL ALLEGATIONS

### Facts Regarding "Ride-Along" Training

11.     The website of the Bedford County Department of Fire & Rescue states:

> Bedford County Department of Fire & made up primarily of volunteers with supplemental career staffing to aid in meeting the public service obligations of the county citizens and visitors. The department provides a wide-range of emergency services to the community. The department is lead [sic] by Chief Jack Jones, Jr. who is responsible for all facets of fire and emergency services operations within Bedford County. The Office of the Chief is comprised of a Deputy Chief of Fire Operations, a Deputy Chief of EMS Operations, a Battalion Chief of Hazardous Materials, a Battalion Chief Wildland Operations, a Field Captain and two Field Lieutenants. The Administrative Manager and Administrative Assistant provide direct support to the organizational structure and functions by performing various administrative, secretarial, and clerical duties.

12.     The county Department of Fire & Rescue ("Fire & Rescue Department") actively recruits volunteers, including minors, to be firefighters and emergency medical technicians.

13.     Jane Doe volunteered to be an Emergency Medical Technician (EMT) with the Huddleston Life Saving & First Aid Crew, Inc. ("Huddleston rescue squad"), which is a

2

volunteer rescue squad that provides rescue services within the county.

14.     Jane Doe's ambition and dream was to be a career EMT after she graduated from high school.  She wrote in her application to be a member of the Huddleston rescue squad:

> I would like to be a Rescue Volunteer because I want a chance to make someone's life better.  We show up on the worst day of someone's life, and we get to make it better.  Being a volunteer is such an honor to have because you help people without being paid or being asked to.  It's just out of the kindness of our hearts.  I believe being a volunteer is making a difference, and I want to try to be a part of that difference.  Because nothing is stronger than the heart of a volunteer.

15.     The county requires EMTs, including volunteer EMTs with the Huddleston rescue squad, to be certified EMTs.

16.     The Virginia Department of Emergency Medical Services has  established certification standards for EMTs in the Commonwealth of Virginia.  A prerequisite for EMT certification is the completion of a specified number of hours of "ride-along" training with a certified EMT.

17.     The county follows the Virginia Department of Emergency Medical Services standards for EMT certification.

18.     The county provides EMT training to EMT trainees, such as Jane Doe, who are members of volunteer rescue squads within the County.

19.     Lieutenant Eddie Witt, a permanent full-time employee of the Fire & Rescue Department and a person supervised by defendant Jones, taught the EMT training class in which Jane Doe was enrolled.

20.     The county required that Jane Doe receive ride-along training to become a certified EMT because the county required EMTs to be certified and a prerequisite for certification was the completion of ride-along  training.

21.     Defendant Jones established a policy, custom, and practice which allowed permanent full-time employees, such as Field Lieutenant Larry Scott Hawkins, to provide ride-along training with underage female volunteer trainee EMTs, including Jane Doe.

22.     At all relevant times, Jones and the entire supervisory chain of command knew that

3

Hawkins was conducting ride-along training of Jane Doe as part of his job duties.

## Facts Regarding Fire & Rescue Department Field Lieutenant Larry Scott Hawkins

23.     Unknown to Jones (but known to the defendants), Fire & Rescue Department Lieutenant Larry Scott Hawkins was a convicted felon.  He had been convicted of the felonies of abduction and use of a firearm, and the misdemeanors of brandishing a firearm and assault and battery.

24.     Hawkins was 52 years old at the time that he was allowed by the Fire & Rescue Department to provide ride-along training to Jane Doe, who was under 18 years of age.

25.     The county had actual knowledge that, and Jones had constructive knowledge (because a criminal background report on Hawkins was made available to Jones but he failed to read it), of Hawkins' criminal convictions.  The County and Jones were provided on May 22, 2007 an "Insight Report," which contained a detailed criminal background history (which included a clearly-understandable report that Hawkins had been convicted of abduction, use of a firearm, brandishing a firearm, and assault and battery).

26.     Cheryl Dean, the Bedford County Human Resources Manager, provided Jones a memo on June 23, 2008 which stated that "Larry Hawkins had a criminal background check completed by the Bedford County Human Resources Office on 05/22/07."  The report did not state that Hawkins was cleared to be hired by the county.

27.     Jones had the authority to approve or veto the hiring of Hawkins.

28.     Jones did not read Hawkins' criminal history report even though it was available to him.

29.     Jones approved the hiring of Hawkins as a firefighter/ paramedic, and Jones later approved the promotion of Hawkins to Field Lieutenant.

## Hawkins' Conduct Against Jane Doe

30.     Jones had actual knowledge that Hawkins was conducting ride-along training with Jane Doe.

31.     The fact that Hawkins was going to conduct the ride-along training of Jane Doe was a

4

topic of conversation between Jane Doe's father and Jones prior to Jane Doe beginning ride-along training with Hawkins, so Jones knew that Hawkins was riding alone with Jane Doe.

32.    Hawkins committed sexual assault and battery against, and obtained carnal knowledge of, Jane Doe on or about February 10, 2018, at 1185 Turning Point Road, Bedford, Virginia in the fire station owned and operated by the county Department of Fire & Rescue during a ride-along training session.

33.    Hawkins' sexual assault of Jane Doe occurred, during the course of, and within the scope of, his assigned job duty of putatively giving ride-along training to Jane Doe.

34.    Jane Doe was a minor at the time that Hawkins committed the sexual assault and battery against, and obtained carnal knowledge of, Jane Doe.

35.    Hawkins threatened Jane Doe against terminating her relationship with him or reporting his abuse and assault of her, telling her that she was responsible for his abuse and assault of her, that her reputation would be jeopardized if she reported the abuse and assault, that she would be shamed and ostracized if she reported the abuse and assault, and that she would be prevented from becoming an EMT if she reported the abuse and assault.

36.    As a direct and proximate result of these county policies, Jane Doe suffered the violation of her substantive due process right under the Fourteenth Amendment of the United States Constitution to be free from state actor conduct that deprived her of her bodily integrity.

37.    As a direct and proximate result of the county's policies,  Jane Doe suffered physical injury and the violation of her body, physical pain, severe emotional distress, emotional and physical pain and suffering, mental anguish, depression, anxiety, injury to her relationships with her family and her community, humiliation, ostracization, the destruction of her dream of becoming an EMT and pursuing a career as an EMT and the loss of earning capacity, medical expenses, litigation expenses, attorney fees and other injury.

## CLAIMS FOR RELIEF
## COUNT I--42 U.S.C. § 1983
## (against Bedford County)

38.     The allegations of paragraphs 1-37 are incorporated herein by reference.

39.     Summary of Count I: Jane Doe's constitutional right to be free from state actor conduct that violated her bodily integrity was violated as a direct and proximate result of Bedford County's de facto policy of deliberate indifference to the rights of volunteers (who, in the words of the department's website "ma[k]e up" the Department of Fire & Rescue) to be free from sexual harassment, abuse, and assault.  The de facto policy consisted of the following affirmative acts:

  o  the county had a practice of hiring employees without reviewing their criminal history,

  o  allowing male Fire & Rescue Department personnel to commit sexual misconduct with impunity,

  o  assigning personnel whose criminal background had not been reviewed to "ride along," and be alone, with underage female volunteer trainee EMTs,

  o  allowing male Fire & Rescue Department employees to groom underage female volunteer trainee EMTs for sexual abuse,

  o  providing a "Shagging Shack" for sexual abuse to occur,

  o  acting with deliberate indifference to specific information that sexual harassment, abuse, and assault was occurring within the Fire & Rescue Department, and

  o  providing no process for female volunteers to report violations by Fire & Rescue Department personnel of their right to be free from state actor violation of their bodily integrity.

### The County Did Not Have a Written Policy Prohibiting its Employees from Committing Sexual Harassment, Abuse, or Assault Against Volunteer EMT Personnel

40.     The Fire & Rescue Department's website states that it is "made up primarily of volunteers with supplemental career staffing to aid in meeting the public service obligations of the county citizens and visitors."

41.     On February 10, 2018, the county relied upon volunteers to provide emergency medical

6

services within the county, and could not have provided adequate emergency medical services without using volunteer EMTs.

42.    The county actively recruited minors to serve as volunteer EMTs.

43.    But, prior to February 10, 2018, the county did not have a SOG or other policy, custom, or practice establishing a procedure for volunteer EMTs to report, or for supervisors to investigate, complaints of sexual harassment and assault committed by the department's permanent full-time employees against volunteer EMTs.

44.    The Department of Fire & Rescue issues Standard Operating Guides ("SOG") as written policies.  The SOGs are approved by Defendant Jones.

45.    Jones directs the issuance of the SOGs and no SOGs may be issued with Jones' approval.

46.    Jones was the final decision making authority in making Fire & Rescue Department policy.

47.    Prior to February 10, 2018, the Fire & Rescue Department did not have a SOG or other policy, custom, or practice prohibiting sexual harassment, abuse, or assault by its permanent full-time employees.

48.    The county's policies prohibiting its employees from committing sexual harassment, abuse, or assault prohibited only sexual harassment, sexual abuse, or sexual misconduct against county employees.

49.    The county's policies regarding the reporting and resolution of complaints of sexual harassment, abuse, or assault applied only to complaints by county employees.

50.    Prior to February 10, 2018, the Fire & Rescue Department did not have a SOG or other written policy, custom, practice, or procedure for the reporting and resolution of complaints of sexual harassment, abuse, or assault *suffered by volunteer trainee EMTs*.

51.    In the absence of a written SOG, the county's policy, custom, and practice was established by custom and practice alone.

**The County's Practice Was to _Not_ Adequately Review the**
**Criminal Background of Applicants for Full-time Employment**
**in the Fire & Rescue Department**

52.     The county's written Personnel Policy Manual requires the county to conduct a criminal background check of all applicants for employment.

53.     12 VAC5-31-910, a Virginia Department of Emergency Services regulation, prohibits any individual convicted of certain crimes (such as abduction) from being certified as an EMT.

54.     But, prior to February 10, 2018, the Fire & Rescue Department had a practice of not adequately reviewing the criminal background of individuals who applied for permanent full-time positions as EMTs.

55.     The practice was that the criminal background investigation report was _made available_ to the Fire & Rescue Department by the Human Resources Manager, but the policy, custom, and practice of the Fire & Rescue Department was to ignore the report and _not review_ the criminal background investigation prior to hiring permanent full-time employees.

56.     This practice was followed when Cheryl Dean, the county Human Resources Manager, provided Jones a memo on June 23, 2008 which stated that "Larry Hawkins had a criminal background check completed by the Bedford County Human Resources Office on 05/22/07." The report did not state that Hawkins was cleared to be hired by the county or that he did not have a violent criminal history.

57.     Jones had the authority to veto the hiring of Hawkins, but he did not check Hawkins' criminal history report.  He approved the hiring of Hawkins by the Fire & Rescue department, even though Hawkins had been convicted of violent felonies that precluded him from being a certified EMT when a requirement of the job that Jones hired Hawkins to perform required that Hawkins be a certified EMT.

**The County had a de facto Policy of Allowing its Male**
**Employees to Sexually Harass and Assault Females While the**
**Male Employees Were on the Job and Using County Facilities**

58.     The department had a de facto policy, custom, or practice of allowing its male permanent

8

full-time employees to sexually harass and assault females while the male employees were on the job and using county facilities.

59.     Proof of this policy is in the county's own internal investigation report, which concluded:

> Cracks are already starting to show in terms of morale and professional misconduct.  From a legal standpoint, Bedford County Fire and Rescue and its satellite volunteer agencies, stand at considerable risk should a Monell claim ever be leveled at Bedford County.  In Monell v. Department of Social Services of New York the U.S. Supreme Court laid out four potential mechanisms in which a plaintiff can establish a municipality or county's liability: 1) Formal rules, regulations, policies or ordinances (or lack thereof 2) Custom/Practice 3) Attribution Method 4) Failure to Train [.]  As this report will show, certain practices, failure to follow policies, and failure to supervise/failure to train are present within the Bedford County Fire and Rescue and need to be addressed.

60.     In the period between March 1, 2018 and April 20, 2018, the county conducted an internal investigation of sexual harassment and misconduct in the Fire & Rescue Department "with a focus on policy and personnel weaknesses."

61.     A report of the investigation was issued on April 24, 2018 by the Bedford County Sheriff's Office, and was written by Sergeant Brian L. Neal of the Professional Standards Unit of the Sheriff's Office.

62.     The report was based on the Sheriff's Office investigation of the county Fire & Rescue Department's "policy and personnel weaknesses."

63.     The investigation report is trustworthy.

64.     The county's internal investigation showed that "certain practices, failure to follow policies, and failure to supervise/failure to train are present within the Bedford County Fire and Rescue and need to be addressed. However, the organizational changes will need to take place beyond just Commands [sic] Staff initiative within the agency.  The change needed must start at the policy-making level within the County Board of Supervisors if we are to truly initiate change and prevent the missteps of the past."

65.     The policy, custom, and practice of the Fire and Rescue Department was to create, in the words of the county's internal investigation report,  "a male dominated culture in which females

9

feel pressure to prove themselves before they are accepted."

66.     The policy, custom, and practice of the Fire & Rescue Department was to allow male employees to sexually assault and harass females with impunity.  Examples of this policy, custom, and practice are:

(a)     In 2008, the department hired Larry Scott Hawkins as a firefighter/paramedic, later promoted him to Field Lieutenant, and allowed him to "ride along" alone with underage female volunteer trainee EMTs, even though he had been previously convicted of abduction, use of a firearm, brandishing a firearm, and assault and battery and posed an unreasonable risk of harm to the underage female volunteer trainee EMTs.

(b)     In 2009, Deputy Chief Mowles sent pictures of his penis by text message to Tamara Dennis, a female career employee of the department.  Mowles used his county-issued cell phone to send the message.  Jones personally knew of Mowles' transmission of the message to Dennis but took no disciplinary action against Mowles as a result of the incident.

(c)     In 2015, Jason Overstreet, an employee of the Fire & Rescue Department, climbed into bed (in the stationhouse bunkroom) with Katie Altman, a "female line employee" of the department, and said he wanted to "snuggle."  Altman told Overstreet to get out of her bed, which he did.  Altman reported the incident through her chain of command.  Altman was told by Department Deputy Chief Mowles that "Boys will be boys," and no disciplinary action was taken against Overstreet.

(d)     Jones was personally aware of Altman's complaint against Overstreet, determined that Altman's complaint was true, but did not change any policy, custom, or practice regarding access to the bunkrooms by members of the opposite sex, change any other policy, custom, or practice, and did not order that any training be conducted regarding inappropriate actions by male employees against female employees.

(e)     Jones knew that the other career employees of the department knew that Mowles had sent the sext message to Dennis.  Jones consistently referred to Mowles as his "Good Son." At the same time, Jones referred to Mowles' female counterpart, also a Deputy Chief, as "Nanny"

and his "sister wife." Jones did not change any policy, custom, or practice regarding access to the bunkrooms by members of the opposite sex or any other policy, custom, or practice and did not order that any training be conducted regarding inappropriate actions by male employees against female employees. Jones' acceptance of Mowles' actions, according to the county's internal investigation report, "sends a very clear message to line staff, and is an excellent illustration of the perception of separate expectations of conduct amongst employees."

     (f)     The Field Lieutenants' bunkroom was known as "The Love Shack" and "The Shagging Shack." Jones personally knew that the Field Lieutenants' bunkroom had earned these monikers because Field Lieutenants had sexual relations with females in the bunkroom. Jones took no action to counsel the Field Lieutenants to modify their behavior and stop having sexual encounters in the bunkroom. Jones took no action to discipline Field Lieutenants or change their job duties so that they did not continue to interact with underage female trainee volunteer EMTs as the volunteers' EMT trainers, did not conduct any training or policy, custom, or practice with a purpose of discouraging inappropriate conduct between adult male career department employees and underage female volunteer EMT trainees, or provide any procedure to allow underage female volunteer EMT trainees to report inappropriate conduct by adult male career department employees towards them.

     (g)     Lieutenant Eddie Witt encouraged personal relationships with underage female trainee volunteer EMTs, "friending" them on Facebook, giving them his cell phone number, and encouraging them to call him to discuss personal problems. Jones personally knew of Witt's conduct, which constituted grooming of the minors for sexual abuse. But Jones took no action to counsel Witt to modify his behavior, took no action to discipline Witt or change his job duties so that he did not continue to interact with underage female trainee volunteer EMTs as their EMT trainer, did not conduct any training or implement any policy, custom, or practice with a purpose of discouraging inappropriate conduct between adult male career department employees and underage female volunteer EMT trainees, or provide any procedure to allow underage female volunteer EMT trainees to report inappropriate conduct by adult male career department

11

2

4

4

7

7

7

5

1

1

employees towards them.

(h)     Hawkins, a Field Lieutenant, groomed underage female trainee volunteer EMTs for sexual abuse by encouraging them to form personal relationships with him, "friending" them on Facebook, sending hundreds of Facebook messages to them about personal and sexual subjects, giving them his cell phone number, encouraging them to call him to discuss personal problems, and encouraging them to lie to their parents about spending time with him.  He sent sexually explicit electronic messages to at least two underage female trainee volunteer EMTs, which constituted sexual abuse as a matter of law.  Hawkins sexually assaulted at least one underage female trainee volunteer EMT.  Upon information and belief, Hawkins' supervisors within the Fire & Rescue Department knew that Hawkins was engaged in inappropriate sexual misconduct, took no action to counsel him to modify his behavior, took no action to discipline him or change his job duties so that he did not continue to interact with underage female trainee volunteer EMTs as their EMT trainer, did not conduct any training or implement any policy, custom, or practice with a purpose of discouraging inappropriate conduct between adult male career department employees and underage female volunteer EMT trainees, or provide any procedure to allow underage female volunteer EMT trainees to report inappropriate conduct by adult male career department employees towards them.

(i)     No employee of the Fire & Rescue Department was disciplined, in any way (including counseling, admonition, or reprimand) for sexual misconduct by Jones prior to February 10, 2018.

(j)     No procedure was ever established to allow underage female volunteer EMT trainees to report inappropriate conduct by adult male career department employees towards them, even though the county's top policymaker (Jones and County Administrator Boggess) knew of the inappropriate conduct to which they were subjected.

67.     As illustrated by these examples, the County had a de facto policy, custom, or practice of:

(a)     inadequately screening employees for a violent criminal history before hiring them and allowing them to be alone with underage female volunteer trainee EMTs, failing to

12

train employees and establish rules and standards for their conduct, and failing to adequately handle complaints regarding employees' sexual misconduct;

(b)     allowing Field Lieutenants to groom underage female volunteer EMT trainees for sexual harassment, abuse, and assault, allowing Field Lieutenants to sexually harass, abuse, and assault underage female volunteer EMT trainees with impunity; and

(c)     allowing Field Lieutenants to use the county bunkroom facility as their "Shagging Shack" to deprive females of their bodily integrity.

68.     The county's deliberate adoption of this policy, custom, and practice is demonstrated by the County's failure to adopt any measures to prevent the examples listed above (in paragraph 66) from recurring, even though the above examples were documented in the Sheriff Office's April 23, 2018 investigation report, and were known to policymakers at all levels of the County, including Defendant Jones and the County Administrator (who received the Sheriff Office's report). The County Administrator's failure to take any action to implement the recommendations of the report demonstrates acceptance of the policy, custom, and practice at the highest level of county policymaking and deliberate indifference to the effects of the policy.

**<u>Jane Doe Suffered a Violation of Her Right to be Free From
State Actor Conduct in Violation of Her Bodily Integrity as
a Direct and Proximate Result of the County's Policy of
of Allowing its Male Employees to Sexually Harass and
Assault Females While the Male Employees Were on the Job
and Using County Facilities</u>**

69.     Hawkins committed sexual assault and battery against, and obtained carnal knowledge of, Jane Doe on or about February 10, 2018, at the fire station owned and operated by the Department of Fire & Rescue during a ride-along training session.

70.     Jane Doe was a minor at the time that Hawkins committed the sexual assault and battery against her.

71.     Hawkins' sexual assault of Jane Doe occurred during the course, and within the scope, of his assigned job duty of putatively giving ride-along training to Jane Doe.

72.     Jane Doe had a well-established constitutional right, under the Fourteenth Amendment of

13

the United States Constitution, to be free from state actor conduct that violated her right to bodily integrity.

73.    Hawkins personally violated Jane Doe's specific right under her substantive due process right to be free from state actor conduct that violated her right to bodily integrity when he committed sexual assault and battery against, and obtained carnal knowledge of, Jane Doe on or about February 10, 2018.

74.    Hawkins acted under color of state law when he violated Jane Doe's constitutional right to be free from state actor conduct that violated her right to bodily integrity because: (1) he acted with the authority he possessed by virtue of his employment as "ride-along" trainer with the county when he directed Jane Doe to go to a part of the fire station at a time when there were no other people to witness his sexual assault of Jane Doe, and then assaulted her; (2) Hawkins would not have been with Jane Doe but for his assignment as her "ride-along" trainer pursuant to his job duties; and (3) he exercised his authority over her, as her trainer, when he directed her to submit to his sexual assault.

75.    The violation of Jane Doe's constitutional rights proximately resulted from the county's policy, custom, or practice of:

(a)      hiring full-time career Fire & Rescue Department personnel without adequately reviewing their criminal history;

(b)      allowing male Fire & Rescue Department personnel to commit sexual misconduct with impunity;

(c)      assigning personnel whose criminal background had not been reviewed to "ride along," and be alone, with underage female volunteer trainee EMTs;

(d)      allowing male Fire & Rescue Department employees to groom underage female volunteer trainee EMTs for sexual abuse;

(e)      providing a "Shagging Shack" for sexual abuse to occur;

(f)      acting with deliberate indifference to specific information that sexual harassment, abuse, and assault was occurring within the Fire & Rescue Department by providing no process

for underage female volunteer trainee EMTs to report sexual harassment, abuse, and assault by Fire & Rescue Department personnel.

76.     The county's policy, custom, and practice demonstrated deliberate indifference to the rights of citizens, and particularly underage female volunteer trainee EMTs, including Jane Doe, to be safe from sexual misconduct by Fire & Rescue department employees.

77.     There was an affirmative causal link between the county's policy and the deprivation of Jane Doe's constitutional right to be free from state actor violation of her bodily integrity:

(a)     The county's continuing failure to adequately review criminal history records of prospective employees demonstrated deliberate indifference to the danger its employees posed, and caused it to hire Hawkins as a Field Lieutenant in charge of emergency services, even though he was a convicted violent felon and was not even qualified to be a certified EMT;

(b)     The county's practice of allowing Field Lieutenants to groom underage female volunteer EMT trainees for sexual harassment, abuse, and assault, when it knew that such grooming was occurring, caused Hawkins to groom Jane Doe;

(c)     The county's policy of allowing Field Lieutenants whose criminal background had not been adequately screened, and whom the county knew had developed inappropriate relationships with underage female volunteer EMT trainees, to ride along, alone, with underage female volunteer EMT trainees caused Hawkins, a violent convicted felon, to sexually assault Jane Doe during a time when he was conducting ride-along training of her and when he was alone with her at the county fire station; and

(d)     The county's policy of fostering a culture of sexual abuse, providing a "Shagging Shack" in the Fire & Rescue department headquarters for male employees to commit sexual misconduct, and failing to discipline, train, or adopt a policy to prevent the known practice of sexual misconduct in the "Shagging Shack," caused Hawkins to commit a sexual assault of Jane Doe in the county bunkroom;

(e)     The county's policy, custom, and practice set in motion a series of events that the county should have foreseen would cause its employee to deprive an underage female volunteer

15

trainee EMT of her constitutional right to be free from state actor violation of their bodily
integrity:

(1)     The county hired Hawkins, a convicted violent felon;

(2)     The county allowed a culture of sexual harassment and abuse within the
Fire & Rescue Department;

(3)     The county did not discipline any of its male employees for sexual
misconduct after they committed sexual misconduct;

(4)     The county relied upon volunteer EMTs;

(5)     The county recruited underage females to be volunteer EMTs;

(6)     The county required the underage female volunteer trainee EMT to
participate in ride-along training;

(7)     The county knew that its Field Lieutenants who trained the underage
female volunteer trainee EMTs were intentionally forming inappropriate relationships with them
and grooming them for sexual abuse, and allowed such conduct;

(8)     The county allowed those Field Lieutenants to be alone with the underage
female volunteer trainee EMTs during the ride-along training;

(9)     The county knew that the Lieutenants' bunkroom was referred to as "The
Shagging Shack" and allowed the Lieutenants to take the underage female volunteer trainee
EMTs to "The Shagging Shack"; and

(10)    Knowing all of this, the county did not provide a procedure for the
underage female volunteer trainee EMTs to report sexual harassment or misconduct by a career
Fire & Rescue department employee against them.

(f)  The inevitable and natural result of the county's policy was the continuation of sexual
misconduct, and Jane Doe's was deprived of her constitutional right to be free from state actor
violation of their bodily integrity as an inevitable consequence of the county's policy;

(g)     And the continuation of the county's policy, custom, and practice, without
correction by the county policymakers (who knew the risks of the county's policy, custom, and

16

practice) was such as to make a sexual assault of an underage female volunteer EMT trainee by a male Field Lieutenant "almost bound to happen, sooner or later."

78.     The county's policy caused the deprivation of Jane Doe's constitutional right to be free from state actor violation of her bodily integrity because the county and its policymakers should have reasonably foreseen that its policy would lead to the sexual assault of Jane Doe or an underage female volunteer EMT trainees like her and the county was deliberately indifferent to the foreseeable consequences of its policy.

        (a)     It was reasonably foreseeable that the county's continuing failure to adequately review criminal history records of prospective employees would result in the hiring of a convicted violent felon;

        (b)     It was reasonably foreseeable that the county's practice of allowing Field Lieutenants, such as Hawkins, to groom underage female volunteer EMT trainees for sexual harassment and abuse, when it knew that such grooming was occurring, would result in one of the Field Lieutenants sexually abusing one of the underage female volunteer EMT trainees who was being groomed, such as Jane Doe;

        (c)     It was reasonably foreseeable that the county's policy of allowing Field Lieutenants, such as Hawkins, whose criminal background had not been adequately screened, and whom the county knew had developed inappropriate relationships with underage female volunteer EMT trainees, to ride along, alone, with underage female volunteer EMT trainees, such as Jane Doe, would lead to the sexual assault of one of the underage female volunteer EMT trainees during a time when one of the Field Lieutenants was conducting ride-along training of a trainee and when he was alone with her at the county fire station;

        (d)     It was reasonably foreseeable that the county's policy of fostering a culture of sexual abuse, providing a "Shagging Shack" in the Fire & Rescue department headquarters for male employees to commit sexual misconduct, and failing to discipline, train, or adopt a policy to prevent the known practice of sexual misconduct in the "Shagging Shack" would lead, in conjunction with the factors stated in the preceding subparagraphs, to one of the Field

17

Lieutenants, like Hawkins (who was grooming underage female volunteer EMT trainees, including Jane Doe, for sexual abuse) to commit a sexual assault of one of the underage female volunteer EMT trainees in the "Shagging Shack."

79.     The county's policy was the "but for" cause of the deprivation of Jane Doe's constitutional right to be free from state actor violation of their bodily integrity:

      (a)     Hawkins, a convicted violent felon, would not have been with Jane Doe but for the county's policy of hiring fire department employees without adequately reviewing the prospective employees' criminal history and assigning employees whose criminal history had not been adequately reviewed to "ride along" with underage female volunteer trainee EMTs;

      (b)     Hawkins would not have been alone with Jane Doe in the Field Lieutenants' bunkroom but for the county's policy of allowing Field Lieutenants to use their bunkroom as a "Shagging Shack"; and

      (c)     Hawkins would not have sexually assaulted Jane Doe but for the county's policy of allowing male Fire & Rescue department employees to commit sexual misconduct with impunity.

80.     Hawkins' assault of Jane Doe was not an intervening cause of her injuries that was separate from the county's policy.  Hawkins' assault of Jane Doe was made pursuant to the county Fire & Rescue department's policy, custom, and practice, but the county also had an affirmative duty, under the state-created danger doctrine, to protect Jane Doe because its policy, custom, and practice established a special, custodial, relationship over Jane Doe when it recruited her as a volunteer EMT, required her to be certified as an EMT, required her to have ride-along training to be certified as an EMT, and assigned Hawkins to be alone with her and conduct the ride-along training in the county's vehicle and stationhouse, and its policy, custom, and practice created and caused the danger which proximately resulted in Jane Doe's constitutional injury.

81.     As a direct and proximate result of this county policy, custom, and practice, Jane Doe suffered the violation of her substantive due process right under the Fourteenth Amendment of the United States Constitution to be free from state actor conduct that deprived her of her bodily

integrity.

82.     The county acted with deliberate indifference to the risk that Hawkins would commit an assault upon underage female volunteer trainee EMTs when it hired Hawkins with the actual knowledge that he had been convicted of abduction, use of a firearm, brandishing a firearm, and assault and battery and assigned him to conduct ride-along training of underage female volunteer trainee EMTs, including Jane Doe, and placed them alone with him and in his custody and care.

83.     The county acted with deliberate indifference to the risk that a sexual assault upon females, such as Jane Doe, would occur when it knew that there was widespread and recurring sexual harassment, abuse, and assault within the Fire & Rescue department but the department utterly and completely failed to conduct any training of Fire & Rescue department personnel about identifying, preventing, stopping, and reporting sexual harassment, abuse, and assault.

84.     The county acted with deliberate indifference to the risk that a sexual assault upon females, such as Jane Doe, would occur when it knew that there was widespread and recurring sexual harassment, abuse, and assault within the Fire & Rescue department but the department utterly and completely failed to discipline any Fire & Rescue department employees for sexual misconduct.

85.     As a direct and proximate result of the county's policy, custom, and practice and deliberate indifference, Jane Doe suffered physical injury and the violation of her body, physical pain, severe emotional distress, emotional and physical pain and suffering, mental anguish, depression, anxiety, injury to her relationships with her family and her community, humiliation, ostracization, the destruction of her dream of becoming an EMT and pursuing a career as an EMT, the loss of earning capacity, medical expenses, litigation expenses, attorney fees and other injury.

### COUNT II--42 U.S.C. § 1983
### (Against John W. Jones, Jr., Chief of Department, Bedford County
### Department of Fire & Rescue, in his individual capacity)

86.     The allegations of paragraphs 1-85 are incorporated herein by reference.

19

87.    Summary of Count II: Jane Doe's constitutional right to be free from state actor conduct that violated her bodily integrity was violated as a direct and proximate result of Jones' deliberate indifference:

o    when Jones hired Hawkins, to the obvious risk that Hawkins would commit another assault of the type that he had been convicted of prior to his hiring and that he committed against Jane Doe after he was hired;

o    when Jones failed to conduct any training of Fire & Rescue department personnel on the identification, prevention, stopping, and reporting of sexual harassment, abuse, and assault, to the risk of sexual harassment, abuse, and assault, after he knew that sexual harassment, abuse, and assault were occurring within the department, knew that Hawkins was a violent felon, and knew that Hawkins was riding along, alone, with Jane Doe;

o    when he failed to investigate or discipline any Fire & Rescue department employee for sexual misconduct, to the risk of sexual harassment, abuse, and assault, after he received reports of sexual misconduct, and even after he came to believe that employees had committed sexual misconduct.

### Jones' Failure to Adequately Review Hawkins' Criminal History Before he Hired Hawkins and Assignment of him to Conduct Jane Doe's Ride-Along Training Demonstrated Deliberate Indifference to Jane Doe's Constitutional Right

88.    Jones was the hiring authority who caused Hawkins to be hired.  He had the sole and final authority to hire Hawkins and had the sole and final authority to decide to not hire Hawkins.

89.    Jones was Hawkins' direct supervisor.

90.    Jones had knowledge that Hawkins had been convicted of felony abduction, felony use of a firearm during an abduction, brandishing a firearm, and assault and battery because the county Human Resources Director sent Jones a memo on June 23, 2008--before he hired Hawkins-- telling him that the report of Hawkins' criminal background was available to review and the information was in the report.

91.    Jones acted with deliberate indifference to the risk that Hawkins would commit an assault upon an underage female volunteer trainee EMTs, such as Jane Doe, when Jones hired him and allowed him to conduct ride-along training, alone, with underage female volunteer trainee EMTs, including Jane Doe.

20

92.    Jones' hiring of Hawkins was a direct and proximate cause of Jane Doe's constitutional injury. If Jones had not hired Hawkins, Jane Doe would not have suffered her injury.

### Jones' Failure to Train Demonstrated Deliberate Indifference to Jane Doe's Constitutional Right

93.    At all times relevant hereto, Jones was the policymaker and administrator of the Fire & Rescue department who had a duty to train, and failed to train, Fire & Rescue department personnel that sexual harassment, abuse, and assault of underage female volunteer trainee EMTs was prohibited and how to report known or suspected abuse of underage female volunteer trainee EMTs, such as Jane Doe.

94.    In the period from as early as Overstreet's assault of Altman in 2015 through February 10, 2018, Jones had actual notice that male employees of the Fire & Rescue Department had, and continued to, sexually harass, abuse, and assault female employees and volunteers within the department, and that Field Lieutenants were in the practice of forming inappropriate personal relationships with underage female volunteer trainee EMTs, such as Jane Doe.

95.    Jones failed to train Fire & Rescue department personnel on, among other things, what constituted sexual misconduct and how to identify, report, investigate, and stop sexual misconduct, and to train volunteers on how to report sexual misconduct directed against them.

96.    Jones' failure to train Fire & Rescue department employees and volunteers on sexual misconduct constituted deliberate indifference to the danger of sexual abuse and assault to underage female volunteer trainee EMTs, such as Jane Doe, when he knew that sexual misconduct was occurring within the department.

97.    Jones' complete and utter failure to train Fire & Rescue department personnel about preventing and reporting sexual misconduct was inadequate in the circumstances of widespread and recurring sexual harassment, abuse, and assault that existed in the Fire & Rescue department and was a direct and proximate cause of Jane Doe's constitutional injury.

98.    If Jones had adequately trained Fire & Rescue department personnel about preventing and reporting sexual misconduct, the constitutional injury to Jane Doe would not have occurred.

21

## Jones' Failure to Discipline Demonstrated Deliberate Indifference to Jane Doe's Constitutional Right

99.    At all times relevant hereto, Jones was the official with the authority to impose, and responsibility for taking, disciplinary action against Fire & Rescue department employees for misconduct.

100.    In the period from as early as Deputy Chief Mowles' transmission of photos of his genitalia to Tamara Dennis in 2009, and through February 10, 2018, Jones had notice that male employees of the Fire & Rescue Department had, and continued to, sexually harass, abuse, and assault female employees and volunteers within the department, and that Field Lieutenants were in the practice of forming inappropriate personal relationships with underage female volunteer trainee EMTs, such as Jane Doe.

101.    Jones failed to investigate or discipline any Fire & Rescue employee for sexual misconduct during that period, after he received a report of sexual misconduct, and even after he came to believe that the employee had committed sexual misconduct.

102.    Jones' failure to investigate or discipline Fire & Rescue Department employees for sexual misconduct constituted deliberate indifference to the danger of sexual abuse and assault to underage female volunteer trainee EMTs, such as Jane Doe, when he knew that sexual misconduct was occurring within the department.

103.    Jones' complete and utter failure to discipline Fire & Rescue Department for sexual misconduct was inadequate in the circumstances of widespread and recurring sexual harassment, abuse, and assault that existed in the Fire & Rescue Department and was a direct and proximate cause of Jane Doe's constitutional injury.

104.    If Jones had disciplined Fire & Rescue Department personnel for sexual misconduct, the constitutional injury to Jane Doe would not have occurred.

105.    Jones acted under color of state law and under the authority he possessed as Chief of the Fire & Rescue Department, and with deliberate indifference to the risk that his conduct posed to the constitutional rights of underage female volunteer EMTs, including Jane Doe, when he hired

22

Hawkins, failed to adequately supervise him, and failed to adequately train and discipline Fire & Rescue Department personnel. He was the person in the decision-making chair whose deliberate indifference permitted the constitutional abuses to continue unchecked.

106.     Jones' conduct was outrageous and intolerable and offends generally accepted standards of decency and morality because he allowed the Fire & Rescue Department to be an agency of widespread and recurring sexual misconduct.

107.     As a direct and proximate result of Jones' deliberate indifference, Jane Doe suffered physical injury and the violation of her body, physical pain, severe emotional distress, emotional and physical pain and suffering, mental anguish, depression, anxiety, injury to her relationships with her family and her community, humiliation, the destruction of her dream of becoming an EMT and pursuing a career as an EMT, the loss of earning capacity, medical expenses, litigation expenses, attorney fees and other injury.

## COUNT III--GROSS NEGLIGENCE
### (against Jones, individually)

108.     The allegations of paragraphs 1-107 are incorporated herein by reference.

109.     Jones had a duty to hire, in the firefighter/paramedic position which he hired Hawkins, a person who did not have a propensity to commit violent crimes that foreseeably posed a threat of injury to others, and which Jones could have discovered with a reasonable investigation.

110.     Jones knew that the firefighter/paramedic who he hired would be responsible for the safety, health, and wellbeing of members of the public.

111.     The job description and qualifications of the position that Hawkins was hired for, and that for the positions that he was later promoted into, required that he be a certified EMT.

112.     12 VAC5-31-910, a Virginia Department of Emergency Services regulation, prohibits any individual convicted of certain crimes (such as abduction) from being certified as an EMT.

113.     If Jones had adequately reviewed Hawkins' criminal background report, he would have known that Hawkins had been convicted of the felonies of abduction and use of a firearm during an abduction, and the misdemeanors of brandishing a firearm and assault and battery.

23

114.    If Jones had adequately reviewed Hawkins' criminal background report, he would have known that Hawkins could not meet the minimum job qualifications for the position.

115.    Jones did not exercise reasonable care in hiring Hawkins because he hired Hawkins even though he did not meet the minimum job qualifications and had committed violent crimes.

116.    Jones acted with gross negligence, wantonly and willfully, and without even the slightest care for the rights of others or the risk of threat of injury to them.

117.    As a direct and proximate result of Jones' gross negligence, Jane Doe suffered physical injury and the violation of her body, physical pain, severe emotional distress, emotional and physical pain and suffering, mental anguish, depression, anxiety, injury to her relationships with her family and her community, humiliation, ostracization, the destruction of her dream of becoming an EMT and pursuing a career as an EMT, the loss of earning capacity, medical expenses, litigation expenses, attorney fees and other injury.

## PRAYER FOR RELIEF

118.    WHEREFORE, plaintiff Jane Doe prays that this Court will enter judgment against the defendants and award her:

(a)    On Count I, compensatory damages in the amount of $10,000,000.00, together with the cost of this suit, legal interest, reasonable attorneys' fees, and such other relief as the Court may deem just and proper under the circumstances;

(b)    On Count II, compensatory damages in the amount of $10,000,000.00, punitive damages in the amount of $350,000.00, together with the cost of this suit, legal interest, reasonable attorneys' fees, and such other relief as the Court may deem just and proper under the circumstances; and

(c)    On Count III, compensatory damages in the amount of $10,000,000.00, together with the cost of this suit, legal interest, and such other relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

119.    Jane Doe demands trial by jury.

24

Respectfully Submitted,

JANE DOE

By: /s/ Gary M. Bowman

Gary M. Bowman, Esq.
VSB No. 28866
2728 Colonial Ave., Ste. 100
Roanoke, Virginia  24015
Tel: (540) 343-1173
gary@garymbowman.com

Easter P. Moses, Esq.
VSB No. 22207
120 W. Church Ave., Ste. 200
Roanoke  VA  24011
Tel: (540) 491-0419
        *Counsel for Plaintiff*